Zachary WILSON

v.

**Jeffrey A. BEARD, Donald T. Vaughn.**

Civ.A. No. 02–374.

United States District Court,
E.D. Pennsylvania.

April 19, 2004.

Michael Wiseman, Federal Defenders, Philadelphia, PA, for Petitioner.

J. Hunter Bennett, Thomas W. Dolgenos, District Attorney's Office, Philadelphia, PA, for Respondents.

## MEMORANDUM

PADOVA, District Judge.

Petitioner Zachary Wilson has filed a Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, and alleges that the prosecutor in his case engaged in intentional racial discrimination during jury selection, in violation of the Fourteenth Amendment to the United States Constitution. For the reasons that follow, the Court will grant Petitioner a Writ of Habeas Corpus.

## I. RELEVANT BACKGROUND

Petitioner was convicted by a jury in the Philadelphia Court of Common Pleas on May 16, 1984, for the February 1, 1982 murder of David Smith following a dispute over a game of craps. Petitioner was sentenced to life imprisonment for this crime. On November 17, 1987, the Superior Court of Pennsylvania affirmed Petitioner's conviction. Petitioner did not seek *allocatur* in the Supreme Court of Pennsylvania. On January 4, 1988, Petitioner filed a *pro se* petition for relief pursuant to the Pennsylvania Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. § 9541, et seq., and appointed counsel subsequently filed an amended petition. This PCRA petition did not assert any claim that the prosecutor had discriminated on the basis of race in the selection of the jury used in Petitioner's trial in violation of *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), or *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). On May 30, 1994, the PCRA Court denied the petition, and on November 13, 1995, the Superior Court of Pennsylvania ("Superior Court") upheld the denial. *Commonwealth v. Wilson,* 373 Pa.Super. 641, 536 A.2d 830 (Pa.Super.Ct.1987). On May 24, 1996, the Supreme Court of Pennsylvania denied Wilson's request for *allocatur.*

On June 2, 1997, Wilson filed a second PCRA petition alleging for the first time a claim under *Batson* and *Swain* on the basis of a videotaped lecture delivered by Jack McMahon, the prosecutor in Petitioner's trial (The "McMahon Tape"). (*See* Hearing Stip. Ex. 1.) This lecture was

given sometime in 1986, two years *after* Petitioner's conviction, but was not released to the public until late March or early April of 1997. (*See* Hearing Stip. ¶ 1.) On February 10, 1999, the PCRA Court denied Petitioner's second PCRA petition, reasoning that Petitioner's claim had been waived pursuant to 42 Pa.C.S.A. 9544(b), which states that a claim is waived if the petitioner could have raised the claim at trial or at an earlier point in the appeals process but failed to do so. *Commonwealth v. Wilson*, No. 2914, at p. 5 (December Term, 1983). On July 31, 2000, the Superior Court affirmed the denial, reasoning that Petitioner's *Batson* claim had been waived pursuant to 42 Pa.C.S.A. § 9544(b). *Commonwealth v. Wilson*, 764 A.2d 1131, No. 783 EDA 1999 (Pa.Super.Ct. Jul. 31, 2000). On March 22, 2001, the Supreme Court of Pennsylvania denied Petitioner's request for *allocatur*. *Commonwealth v. Wilson*, 565 Pa. 671, 775 A.2d 806 (2001). Thus, no Pennsylvania state court has determined the merits of Petitioner's *Batson* claim.

Subsequent to his conviction in the instant matter, Petitioner was convicted and sentenced to death for an unrelated homicide. *Commonwealth v. Wilson*, 538 Pa. 485, 649 A.2d 435 (1995). Petitioner is currently on death row at the State Correctional Institution at Graterford ("Graterford Prison") awaiting execution. According to Petitioner, his conviction in the instant case was presented in his capital case as an aggravating circumstance in determining his eligibility for the death penalty. (Habeas Pet. at 4, n.2).

On January 23, 2002, Petitioner filed a counseled petition for habeas corpus in this Court, asserting racially biased jury selection under *Batson* and *Swain*. In an opinion dated May 9, 2003, this Court held that Petitioner's claim of racially discriminatory jury selection was neither time barred nor procedurally defaulted, and ordered that an evidentiary hearing be held on the merits of Petitioner's claim. *See Wilson v. Beard*, Civ. A. No. 02–374, 2003 U.S. Dist. Lexis 9737 (E.D.Pa. May 8, 2003). On September 29, 2003, this Court held a hearing on the merits of Petitioner's claim. At the hearing, Petitioner entered the McMahon Tape into evidence. In addition, the parties stipulated at the hearing that eight of the sixteen peremptory strikes exercised by Jack McMahon at Petitioner's trial were exercised against African–Americans. (Hearing Stip Ex. 4.) The parties also stipulated that the jury at Petitioner's trial consisted of nine whites and two blacks (Hearing Stip Ex. 3.) The parties have further stipulated that the race of the second alternate juror was white. (*Id.*) The race of one of the jurors who sat on Petitioner's jury, as well as the race of the first alternate juror, have not been stipulated to and are apparently unknown. (*Id.*) Petitioner has also submitted evidence which he asserts establishes that four of the remaining eight jurors against whom Mr. McMahon exercised peremptory strikes were African–American. Upon review of this evidence, the Court finds as fact that a total of nine jurors against whom Mr. McMahon exercised peremptory strikes were African–American.[1] Un-

---

1. Petitioner has submitted voter registration materials which he asserts establish that three additional jurors against whom Mr. McMahon exercised peremptory strikes were black. (Pet's Hearing Exs. 1, 3–4.) Petitioner asks the Court to so find as fact. Respondents dispute Petitioner's assertion, and argue that the voter registration materials only establish that a person whose name matches the name

of a stricken juror was black. Indeed, the names of the three jurors, Brenda Ford, Donna Moses, and Dana Moore, would appear to be fairly common. Moreover, Respondents produced motor vehicle records from the Pennsylvania Department of Transportation for persons using the names Brenda Ford and Donna Moses. (Resp. Hearing Ex. C–1). These motor vehicle records demonstrate that

fortunately, it is not disputed that, with one small exception,[2] the entire transcript and the court reporter's tapes of the voir dire proceedings at Petitioner's trial have been lost and are currently unavailable. (Hearing Stip ¶6.) At the hearing, Mr. McMahon testified that, because of the passage of nearly twenty years since the time of trial, with one exception, he had "no idea" why he exercised peremptory strikes against these potential jurors. (9/23/03 N.T. at 43–49.)

## II. STANDARD OF REVIEW

■ The state court in this case never addressed the merits of Petitioner's *Batson* claim, because it found that the claim was procedurally defaulted pursuant to state law. Accordingly, the Court makes a *de novo* determination of this claim. *See Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001) ("It follows that when, although properly preserved by the defendant, the state court has not reached the merits of a claim thereafter presented to a federal habeas court, the deferential standards provided by AEDPA ... do not apply ... [and] the federal habeas court must con-

duct a de novo review over pure legal questions and mixed questions of law and fact...."). However, any factual determinations of the state court that would be relevant to Petitioner's *Batson* claim "are still presumed to be correct, rebuttable only upon a showing of clear and convincing evidence." *Id.*

## III. DISCUSSION

■ In *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court recognized that the practice of exercising peremptory challenges provides an opportunity for prosecutors so inclined to engage in discrimination. Accordingly, the Court in *Batson* established a three part burden shifting procedure to be used in determining whether a prosecutor had engaged in racially discriminatory jury selection practices. Under *Batson*, "Once the defendant makes a prima facie showing of racial discrimination (step one), the prosecution must articulate a race-neutral explanation for its use of peremptory challenges (step two). If it does so, the trial court must determine whether the defendant has es-

---

there are multiple persons listed under the names of both Brenda Ford and Donna Moses. Moreover, while the motor vehicle records contain photographs for some drivers using the names of Brenda Ford and Donna Moses, the records for other drivers listed under these names do not contain matching photographs. Indeed, according to the motor vehicle records, the only driver listed under the name of Donna Moses who resides in Philadelphia does not appear to be African–American. (*See* Resp. Hearing Ex. C–2, at 5.) Petitioner has ·also submitted an affidavit from Manuel Williams, who states that he is married to a woman known as Dana Moore. (Pet's Hearing Ex. 3.) However, Mr. Williams does not state in his affidavit that his wife served on Petitioner's jury. Accordingly, the Court cannot find as fact that the jurors stricken at Petitioner's trial under the names of Brenda Ford, Donna Moses and Dana Moore were African–American.

Petitioner has also provided two affidavits from Renee McNeil, the widow of a man named James McNeil. (Pet's Hearing Ex. 2.) A juror named James McNeil was stricken by Mr. McMahon at Petitioner's trial. Ms. McNeil indicates that her husband, who was black, was called for jury service in Petitioner's case in 1984, and was not selected as a juror. (*See id.*) Ms. McNeil indicates that she remembers this information because, when her husband returned home after having not been selected, he commented to her that he felt that race had been a factor in the prosecutor's decision to strike him. (*See id.*) Upon review of these affidavits, the Court finds as fact that the juror named James McNeil who was stricken at Petitioner's trial was African–American.

2. There is a twenty page transcript of the voir dire proceedings of May 10, 1984. The contents of this transcript do not appear to be relevant to the instant case.

tablished purposeful discrimination (step three)." *Riley v. Taylor*, 277 F.3d 261, 275 (3d Cir.2001) (citations omitted).

## A. Step 1—Prima Facie Case

■ Under *Batson*, "A court should consider all relevant circumstances in assessing whether a prima facie showing of discrimination has been made." *Holloway v. Horn*, 355 F.3d 707, 722 (3d Cir.2004). The United States Court of Appeals for the Third Circuit ("Third Circuit") "has identified five factors that are generally relevant in this inquiry: 1) the number of racial group members in the panel; 2) the nature of the crime; 3) the race of the defendant; 4) a pattern of strikes against racial group members; and 5) the questions and statements during the voir dire." *Id.* (quoting *United States v. Clemons*, 843 F.2d 741, 748 (3d Cir.1988)). In *Holloway*, the Third Circuit specifically rejected a rule, which had been utilized in Pennsylvania state courts, which required a Petitioner to make a record identifying the race of the venire persons stricken by the prosecution, as well as the racial composition of the final jury selected, in order to establish a prima facie case of discrimination under *Batson*. The *Holloway* court reasoned that "The defendant's burden at the initial [prima facie] stage is to show merely that jurors of his race have been struck and that the strikes are indicative of an improper motive." *Id.* at 728. The court also noted that "a defendant's *Batson* objection need not always be based upon a pattern of strikes; it can be based, for example, on a single strike accompanied by a showing that the prosecutor's statements and questions to the juror (or to prior jurors) support an inference of discrimination." *Id.*

■ While the analysis in this case is admittedly hampered by the fact that we do not have a transcript of the voir dire proceedings, there is still more than sufficient circumstantial evidence of Mr. McMahon's use of racial discrimination in the selection of Petitioner's jury to establish a prima facie case under *Batson*. First, in the McMahon Tape, Mr. McMahon describes in great detail his strategy of systematically excluding certain types of black jurors in cases that he tried. Specifically, Mr. McMahon describes in the Tape his practice of striking all African–American potential jurors from low income neighborhoods, striking young African–American women, and striking older African–American women in cases involving young black male defendants.[3] (McMahon Tape at 47, 56–57.) Mr. McMahon, realizing that these practices were in direct contravention of *Batson*, also described techniques which could be utilized to avoid detection, such as questioning black jurors more carefully in order to ensure that one had a non-discriminatory reason for striking the juror if an objection were made. (McMahon Tape at 70.) Many of the practices described in the McMahon Tape are therefore blatantly discriminatory on their face, as the Pennsylvania Supreme Court, which previously had occasion to consider the contents of the Tape, has found. *See Commonwealth v. Basemore*, 560 Pa. 258, 744 A.2d 717, 731 (2000) ("we condemn in the strongest terms the practices described in the transcript [of the McMahon Tape], which flout constitutional principles in a highly flagrant manner.") This Court similarly condemns the discriminatory jury selection practices described in the McMahon Tape.

In the Tape, Mr. McMahon clearly states that he always adhered to the same

---

**3.** According to the habeas corpus petition, Petitioner was 46 at the time that the Petition was filed on January 23, 2002. (*See* Habeas Corpus Petition at 19.) Petitioner, an African–American, was therefore in his late twenties at the time of his trial.

strategy when picking a jury, no matter what the circumstances. (*See* McMahon Tape at 3, 62.) Specifically, Mr. McMahon states in the Tape that "I think you pick the same jury. I don't care if it's a black, white, Puerto Rican, Chinese, or what. You pick the same jury." (*Id.* at 62.) Mr. McMahon further stated that "And that's all I can tell you ... is to play by certain rules and don't bend them and don't change them." (*Id.* at 3.) Indeed, in *Basemore*, the Pennsylvania Supreme Court, in considering a similar case brought by an African–American defendant who had been tried by Mr. McMahon, found that "there can be no question that the practices described in the transcript [of the McMahon Tape] support an inference of discrimination on the part of any proponent." 744 A.2d at 731–32. Accordingly, the Court finds that the McMahon Tape provides strong circumstantial evidence of the fact that Mr. McMahon engaged in racial discrimination in picking the jury at Petitioner's trial.

■ The strong circumstantial evidence provided by the McMahon Tape is supplemented by the fact that at least nine of the sixteen jurors against whom Mr. McMahon exercised peremptory strikes at Petitioner's trial were African–American (Hearing Stip Ex. 4), thereby providing additional circumstantial evidence that the strikes were racially motivated. *See McCain v. Gramley*, 96 F.3d 288, 292 (7th Cir.1996) ("Where a party uses a significant number of its total strikes on members of a certain racial group, one might infer that the party was concerned about the racial make-up of the jury and acted in a discriminatory fashion.") (internal citation omitted). Moreover, according to the record the jury panel at Petitioner's trial consisted of nine whites and only two African–Americans, with the race of one juror unknown. (Hearing Stip Ex. 3.) Mr. McMahon's own testimony at the evidentiary hearing concerning his use of race in the jury selection process further bolsters Petitioner's prima facie case. Specifically, when asked whether race was ever a factor in his decision to exercise peremptory challenges, Mr. McMahon responded with an equivocal answer and did not entirely discount the possibility that race was relevant in his decision-making. Mr. McMahon testified as follows:

> The Court: Did race ever play a factor in your determining who to challenge and who not to challenge peremptorily? Mr. McMahon: I understand. Do you—that's a tough question, Your Honor. I can't say that it—because sometimes they're intertwined. I would say that—was it ever a factor? In some ways, I guess, yes. In some ways I would think—in certain situations, maybe, but only because of its correlation to another factor, not because of the color of their skin. It was really other things and its because of other issues that would be the reason for a peremptory strike. I don't see race as being the reason.

(9/23/03 N.T. at 43.)[4] Accordingly, the Court finds that Petitioner has established

---

4. Respondents argue that Mr. McMahon's testimony at the evidentiary hearing establishes that race was never the motivating factor in Mr. McMahon's decision to strike potential jurors. The Court rejects Respondents' reading of Mr. McMahon's testimony as inconsistent with Mr. McMahon's statements in the McMahon Tape itself. Indeed, Mr. McMahon made clear in the Tape that his decision to strike jurors was motivated in part by race.

For example, Mr. McMahon advocates in the Tape the exclusion of young *African–American* women from jury panels, not the exclusion of *all* young women from jury panels. (*See* McMahon Tape, at 57.) Accordingly, if Mr. McMahon's testimony was intended to suggest that Mr. McMahon was solely motivated by factors other than race with respect to all of his peremptory challenges in this case, the Court finds such testimony not to be credible.

a prima facie case of discrimination under *Batson.*

B. *Step 2—Race Neutral Reasons for Mr. McMahon's Strikes*

 When a petitioner establishes a prima facie case under Step One of *Batson,* the burden falls upon the prosecutor to provide a race neutral reason for its decision to strike each individual African–American juror. A prosecutor's failure to provide any explanation for the peremptory strikes that she made will not satisfy the prosecution's burden at Step Two. *See Batson,* 476 U.S. at 98, 106 S.Ct. 1712 ("Nor may the prosecutor rebut the defendant's case merely by denying that he had a discriminatory motive or [affirming] [his] good faith in making individual selections.") Moreover, the mere fact that other jurors of the defendant's race served on the defendant's jury does not, in itself, rebut the petitioner's prima facie case that race played a part in the peremptory strikes of individual jurors. *See Harris v. Kuhlmann,* 346 F.3d 330, 346 (2d Cir. 2003). However, if the prosecutor does state a race neutral reason for the strike of an individual juror, this reason will be deemed sufficient regardless of whether the Court finds the reason persuasive, or even plausible. *Purkett v. Elem,* 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). In *Purkett,* the Court wrote that "It is not until the *third* step that the persuasiveness of the justification becomes relevant—the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination." *Id.* at 768, 115 S.Ct. 1769.

 Accordingly, the burden of the prosecutor to come forward with a race

neutral reason for an individual strike is a burden of production, not of persuasion, and "the ultimate burden of persuasion regarding racial motivation rests with, *and never shifts from,* the opponent of the strike." *Id.* (citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)) (emphasis in original). Even a rationale that appears entirely unrelated to the facts of the case at hand will satisfy the prosecutor's burden at Step Two, unless "a discriminatory intent is inherent in the prosecutor's explanation." *Hernandez v. New York,* 500 U.S. 352, 360, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).

 At the September 29, 2003 hearing, Mr. McMahon failed to articulate a non-discriminatory reason for all but one of the peremptory strikes that he exercised against African–Americans at Petitioner's trial.[5] Mr. McMahon testified at the hearing that he simply could not remember the reasons for the individual strikes, even when he attempted to refresh his memory by examining the notes that he took during the voir dire process. Petitioner argues that, as Mr. McMahon failed to articulate any race neutral reason for his decision to strike multiple potential black jurors, Respondents have failed to carry their burden under Step Two of *Batson.*

Given the unique factual circumstances of this case, the Court disagrees. First, as discussed, *supra,* after the Supreme Court's decision in *Purkett v. Elem,* the burden on the prosecution to provide a race neutral reason is extremely light, and cases in which a Petitioner has succeeded on a *Batson* challenge because the prosecutor failed to satisfy his burden under Step Two are extremely rare.[6]

---

**5.** Mr. McMahon did testify at the hearing that he struck one African–American juror, Darrell Lampkin, because his brother had been convicted of a crime and was currently incarcerated. (*See infra,* § 3.)

**6.** The burden of the prosecution at Step Two has been likened to the burden an employer faces under the *McDonnell Douglas* burden shifting procedure for employment discrimination cases to articulate a legitimate, nondis-

Petitioner relies heavily upon a case from the United States Court of Appeals for the Eleventh Circuit, *Bui v. Haley*, 321 F.3d 1304 (11th Cir.2003), in which a petitioner established a *Batson* violation based upon the failure of the prosecutor to articulate a non-discriminatory explanation for his strikes under Step Two of the *Batson* procedure. However, in that case, the lead prosecutor at the trial, Mr. Evans, never articulated reasons for the peremptory strikes he chose to exercise on an individual, juror by juror basis. Rather, Mr. Evans gave only a general statement at the time of jury selection concerning his peremptory strikes which disavowed any reliance upon race. Mr. Evans stated that "We struck those who we believed would acquit. Those strikes were not based on race but on just our exercising our right to strike jurors we feel would be most favorable to acquit. On that ground[ ] only." *Id.* at 1309. Moreover, Mr. Evans did not appear at a subsequent hearing on the petitioner's *Batson* challenge held in state court. Rather, only Ms. Brooks, the counsel who served as second chair during the trial, was present at the hearing. It was clear from the record that Mr. Evans, and not Ms. Brooks, made the ultimate decisions as to whether to exercise peremptory strikes. *Id.* at 1315. Moreover, "even though Brooks had three opportunities to do so, she never claimed to have actually discussed with Evans his reasons for each of the strikes he exercised." *Id.* The *Bui* court therefore found that "the trial court could not reasonably have found that Brooks was in a position to know the inner workings of Evans's mind at trial-specifically, that race did not play a significant

role in his decision making." *Id.* Accordingly, the *Bui* court held that, because there was absolutely no evidence of the state of mind of the prosecutor who actually exercised the strikes at Petitioner's trial, the prosecution had failed to satisfy its burden at Step Two of the *Batson* analysis.

*Bui* therefore rests heavily upon the fact that the prosecution in that case failed to produce any evidence of the prosecutor's state of mind during the voir dire process. Accordingly, the submissions made by the prosecution's co-chair at trial concerning the prosecutor's motivation for the strikes amounted to nothing more than speculation and post-hoc rationalizations by a third party. *See also Hardcastle v. Horn*, No. 98–CV–3028, 2001 WL 722781, at *16 (E.D.Pa. June 27, 2001) (prosecution failed to rebut inference of discrimination where prosecutor stated that she was unable to remember the specific reasons for her strikes and made only a general denial of racial discrimination). By contrast, the McMahon Tape provides strong circumstantial evidence of the actual state of mind of Mr. McMahon during the jury selection process at Petitioner's trial. Indeed, as discussed, *supra*, Mr. McMahon was quite clear in the Tape that he systematically engaged in the practices described in the Tape in every case that he tried, including the systematic exclusion of certain categories of African–American jurors from panels. However, on the Tape Mr. McMahon also describes a number of race neutral reasons for striking jurors from jury panels. Specifically, Mr. McMahon described on the Tape his practice of striking the following groups from jury

criminatory reason for its employment action. *See Bui v. Haley*, 321 F.3d 1304, 1320 n. 3 (11th Cir.2003). A law review article noted in 1998 that "there is not a single reported case in which a plaintiff prevails at the second step in a discrimination lawsuit because a defendant employer is unwilling or unable to artic-

ulate a legitimate, nondiscriminatory reason for its employment action." D. Chin and J. Golinsky, *Moving Beyond McDonnell Douglas: A Simplified Method for Assessing Evidence in Discrimination Cases*, 64 Brook. L.Rev. 659, 665 (1998).

panels, among others: "esoteric" people, doctors, lawyers and social workers. Furthermore, it appears from Mr. McMahon's statements on the Tape that he would strike jurors who fit into these broad categories regardless of their race.[7] Finally, and importantly, in the Tape Mr. McMahon never advocated striking *all* African–American jurors. Rather, while Mr. McMahon advocated striking large categories of African–American jurors, certain African–American jurors, including older black men and blacks from the South, were considered desirable. (McMahon Tape at 56.)

Moreover, although it is unfortunate that Mr. McMahon was unable to articulate specific reasons for all but one of his peremptory strikes at the hearing, under the facts of this case Mr. McMahon's inability to do so cannot be deemed unreasonable. First, there is no dispute that Petitioner never argued at his trial that Mr. McMahon had engaged in racially discriminatory jury selection practices.[8] Thus, Mr. McMahon was never called upon to articulate race neutral reasons for his strikes at the time of trial.[9] Second, through no fault of either party, no record of the voir dire proceedings is presently available in this case. Third, nearly twenty years have passed since the date of Petitioner's trial. Accordingly, it is neither surprising nor unreasonable that Mr. McMahon was unable to remember the reasons why he chose to strike a particular juror at Petitioner's trial.

Accordingly, the Court finds that, under the unique factual circumstances of this case, Mr. McMahon's inability to articulate race neutral reasons for all of the individual strikes that he made is not fatal to Respondents' ability to satisfy Step Two of *Batson.* To be sure, as noted, *supra,* general denials of racism and affirmances that a prosecutor acted in good faith are not sufficient to satisfy Step Two of *Batson. See Batson,* 476 U.S. at 98, 106 S.Ct. 1712. However, the McMahon Tape provides more than general denials of racism. Rather, the McMahon Tape clearly provides numerous specific race neutral reasons for striking prospective jurors, reasons which appear to be sufficient, in and of themselves, to cause Mr. McMahon to utilize a peremptory strike against a juror regardless of that juror's race. Accordingly, just as the McMahon Tape provides circumstantial evidence that race may have played a part in the jury selection at Petitioner's trial, the McMahon Tape at the same time provides circumstantial support for Respondents' argument that factors other than race may have been responsible for Mr. McMahon's peremptory strikes. Indeed, the Court has already found that Petitioner has satisfied Step One of *Batson* based primarily upon the statements made in the McMahon Tape, notwithstanding the virtual absence of any record of the jury selection process at Petitioner's trial besides Mr. McMahon's trial notes. Accordingly, in the interest of fairness, the Court will allow Respondents to rely upon the many

7. Mr. McMahon states in the Tape "This goes across the board of all races; you don't want smart people." (McMahon Tape at 55.) Mr. McMahon further states that "Don't ever take a law student. Don't ever take a lawyer. Don't ever do that. I did it once. I'll never do it again." (McMahon Tape at 52.)

8. In its May 9, 2003 Order and Memorandum, this Court excused Petitioner's failure to object to Mr. McMahon's strikes at the time of

trial because Petitioner did not have access to the McMahon Tape until it was made public more than a decade later. *See Wilson v. Beard,* Civ. A. No. 02–374, 2003 U.S. Dist. Lexis 9737 (E.D.Pa. May 8, 2003).

9. Indeed, because Petitioner's trial occurred two years before *Batson* was decided, Mr. McMahon would likely not have been required to articulate race neutral reasons for his strikes even if Petitioner had objected.

race neutral reasons for striking individual jurors listed in the McMahon Tape when attempting to meet their burden under Step Two of *Batson*. The Third Circuit has endorsed the concept that the prosecution may, in an appropriate case, utilize circumstantial evidence in order to satisfy its burden under Step Two of *Batson*. *See Johnson v. Love*, 40 F.3d 658, 667 (3d Cir.1994) ("we are unwilling to rule out the possibility that the state may be able to satisfy its step two *Batson* burden by tendering circumstantial evidence.") The Court finds that this case presents the type of factual situation contemplated in *Johnson*.[10] Accordingly, the Court finds that, by presenting through the McMahon Tape numerous specific race neutral reasons for striking jurors, any of which may have been responsible for Mr. McMahon's decision to strike individual jurors in Petitioner's case, Respondents have satisfied the requirements of Step Two of *Batson*.

### 3. *Step 3—Purposeful Discrimination*

In Step Three of *Batson*, Petitioner must establish, by a preponderance of the evidence, that Mr. McMahon's decision to strike at least one juror at Petitioner's trial was motivated at least in part by race. *See McKinney v. Artuz*, 326 F.3d 87, 98 (2d Cir.2003) (noting that, at Step Three of *Batson*, "the court must determine whether the moving party carried the burden of showing by a preponderance of the evi-

dence that the peremptory challenge at issue was based on race.") (citing *Batson*, 476 U.S. at 98, 106 S.Ct. 1712; *Hernandez*, 500 U.S. at 359, 111 S.Ct. 1859.)

The traditional method by which a defendant successfully meets his burden is by attacking the validity of the race neutral reasons for the strikes provided by the prosecutor in Step Two of *Batson*. *Rico v. Leftridge–Byrd*, 340 F.3d 178, 185 (3d Cir.2003) ("At step three, 'the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.' ") (quoting *Miller–El v. Cockrell*, 537 U.S. 322, 339, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003)); *see also Hernandez*, 500 U.S. at 363, 111 S.Ct. 1859. In determining whether the prosecutor's stated reason is pretextual, a court must examine the totality of the relevant facts. *Rico*, 340 F.3d at 185. Relevant considerations include the fact that the prosecutor did not strike white jurors who met the same race neutral criteria that the prosecutor provided as a justification for striking black jurors. *Id.* As noted, *supra*, with the exception of one juror, Daryl Lampkin, Mr. McMahon did not provide any explanation for the peremptory strikes that he made.[11]

---

**10.** The Court's opinion should in no way be read to relieve a prosecutor from his burden under Step Two of *Batson* to articulate specific race neutral reasons for his decision to strike a specific juror when a prima facie case under *Batson* is established, if, when considering the circumstances, the prosecutor should reasonably be expected to be able to do so. The Court merely holds that, under the facts of this case, where it is not reasonable to expect Mr. McMahon to be able to articulate a specific race neutral reason for the strikes that he made due to circumstances beyond his control, Respondents may resort

to circumstantial evidence in order to satisfy Step Two of *Batson*.

**11.** Mr. McMahon, after examining his trial notes, testified that he struck Mr. Lampkin because Mr. Lampkin's brother had been convicted of a crime and was currently incarcerated. (9/23/03 N.T. at 47.) Petitioner argues that Mr. McMahon's stated explanation for striking Mr. Lampkin is pretextual, because Mr. McMahon did not strike a potential white juror whose sister had been arrested. (*See* 9/23/03 N.T. at 51.) However, there is a large difference between being arrested and being

However, notwithstanding the emphasis that courts have placed at Step Three of *Batson* upon examining the reasons given by the prosecutor at Step Two for evidence of pretext, it is clear that a court may examine all relevant circumstances in determining whether the petitioner has met his ultimate burden of persuasion. For example, in *Miller–El*, the Supreme Court held that "historical evidence of racial discrimination" in the district attorney's office that prosecuted the defendant was relevant to a determination of whether a petitioner had established a *Batson* claim. 537 U.S. at 347, 123 S.Ct. 1029. In *Miller–El*, evidence had been presented establishing that the Dallas County District Attorney's Office, the office that had prosecuted the defendant, had "almost categorically" excluded African–Americans from jury service. *Id.* The Court held that such evidence was "relevant to the extent that it casts doubt on the legitimacy of the motives underlying the State's actions in petitioner's case." *Id.*

▬ The strongest evidence in support of Petitioner's assertion that Mr. McMahon engaged in discriminatory jury selection practices at his trial is, of course, the McMahon Tape itself. Mr. McMahon admitted during his testimony at the hearing that, "by and large," the presentation that he gave in the McMahon Tape was an accurate summary of the manner in which he conducted jury selection. (9/23/03 N.T. at 38.) Indeed, with the exception of a story he relates in the Tape about feigning illness in order to obtain a more favorable jury panel, which Mr. McMahon admitted was not true, Mr. McMahon testified that the Tape was accurate. (9/23/03 N.T. at 39.) The Court finds Mr. McMahon's testimony to be credible in this regard. Moreover, as discussed, *supra*, Mr. McMahon was quite clear in the Tape that he always followed the same practice in selecting juries, regardless of the circumstances of the case.[12] Respondents point out that Petitioner's trial occurred in 1984, and the McMahon Tape was not made until at least 1986. Thus, Respondents argue that, although the Tape may have represented Mr. McMahon's practice in picking juries in 1986, the procedures followed in the Tape do not necessarily represent Mr. McMahon's practice at the time of Petitioner's trial. Mr. McMahon does indicate on the Tape that he developed the procedure he used to pick juries over time. Specifically, Mr. McMahon states that: "I'm going to tell you things that I think over the years that have come to me of doing this." (McMahon Tape at 47.) However, the argument that Mr. McMahon's policy of systematically excluding certain types of black jurors from jury panels only developed between the time of Petitioner's trial and the time that the McMahon Tape was made ultimately lacks credulity. Nowhere in the Tape does Mr. McMahon indicate that he had developed this policy, or any of the other policies

---

convicted of a crime and thereafter being sentenced to prison. Accordingly, Mr. McMahon's stated reason for striking Mr. Lampkin does not, in itself, support Petitioner's assertion that Mr. McMahon's strike of Mr. Lampkin was motivated by racial discrimination.

12. In the Tape, Mr. McMahon compared the jury selection process to a game of blackjack, and insisted that one should always adhere to the same rules when picking a jury, regardless of the situation. Mr. McMahon stated:

But the key is, just as in playing blackjack, is to stay by the rules. You know, when you're going in ... down Atlantic City, the people that generally win at blackjack are the people that have certain rules. They stay by them; they continue. Some days they're going to lose, they're going to get that bad card flipped on them—and you may get the bad juror flipped on you—but over the long haul, these people playing blackjack are going to win because they stayed by certain rules.
(McMahon Tape at 3.)

described in the Tape, only recently. Moreover, Mr. McMahon began his career with the district attorney's office in 1978, six years before Petitioner's trial. (9/23/03 N.T. at 49–50). Thus, it is hard to believe that Mr. McMahon had not developed his jury selection practices by the time of Petitioner's trial.

The assertion that Mr. McMahon engaged in the race-based jury selection practices described in the Tape at Petitioner's trial is bolstered by evidence of the pattern of strikes that Mr. McMahon made. The parties do not dispute that Mr. McMahon exercised at least eight of his sixteen peremptory strikes against African–American jurors, and further that the jury panel in Petitioner's case consisted of nine white jurors and two black jurors. The racial composition of the jury panel in Petitioner's case closely matches the racial composition that Mr. McMahon stated he strove for in the McMahon Tape. Specifically, in the Tape Mr. McMahon warned against picking an all-white jury, for fear of reverse racism. Instead of an all-white jury, Mr. McMahon stated that "I've always felt that a jury of like eight whites and four blacks is a great jury, or nine and three." (McMahon Tape at 59).[13] Mr. McMahon stated that, with such a jury, "You're not going to get any of that racist type of attitude because a white guy is not going to sit in that jury and say, 'Aw, them people live like this and that' with other blacks sitting there in the room." (*Id.*)

Furthermore, Mr. McMahon noted the race, as well as the gender, of the 12 jurors empaneled at Petitioner's trial. (*See* Hearing Stip. Ex. 2.)[14] Petitioner's trial occurred two years before the *Batson* decision was handed down,[15] and Respondents have offered no other legitimate rationale for Mr. McMahon's decision to make such notations. Accordingly, the Court draws the reasonable inference that Mr. McMahon noted the race of these jurors because race played a role in his decision-making process during voir dire at Petitioner's trial.

Accordingly, upon consideration of all relevant circumstances, the Court finds as fact that the jury selection practices that Mr. McMahon describes in the Tape are the jury selection practices that Mr. McMahon engaged in during Petitioner's trial.

However, the Court's finding that Mr. McMahon practiced what he preached in the McMahon Tape at Petitioner's trial does not end the Court's inquiry. For, as noted, *supra,* Mr. McMahon never advocated the wholesale exclusion of all black jurors from jury panels. Rather, Mr. McMahon was quite clear that he only disapproved of *certain categories* of black jurors. Specifically, Mr. McMahon clearly disapproved of African–American jurors from low income areas. (McMahon Tape at 47.) In addition, Mr. McMahon disapproved of older black women, at least in

---

**13.** As noted, *supra,* the parties have agreed that the jury panel in Petitioner's case consisted of nine white jurors and two black jurors, with the race of one empaneled juror unknown. (*See* Hearing Stip. Ex. 3.) Accordingly, it is very possible that the jury panel in Petitioner's case consisted of nine white jurors and three black jurors.

**14.** Mr. McMahon's written notes identify the race and gender of empaneled jurors with symbols (i.e., "WF" and "BF"). Mr. McMahon confirmed during his testimony at the

hearing that "B" and "W" stood for black and white and "F" and "M" stood for female and male. (9/23/03 N.T. at 52.)

**15.** The holding in *Batson* provides an incentive for prosecutors to note the race of stricken prospective jurors, as well as the race of jurors actually empaneled, in order to assist them in meeting their burden at Step Two of providing race neutral reasons for the strikes they have made if a defendant establishes a prima facie case.

cases involving young black male defendants, and young black women. (McMahon Tape at 56–57.) [16] By contrast, Mr. McMahon found older black men, and blacks from the South, to be excellent jurors. Mr. McMahon stated that:

> I tell you, I don't think that you will ever lose a jury with blacks from South Carolina. They're dynamite. They're dynamite. They just have a different way of living down there, a different philosophy. And they're law and order and they're on the cops' side. And those people are good.

(McMahon Tape at 57–58.) Indeed, according to Mr. McMahon, "I've seen DA's who strike [older black jurors] because they're black, and that's kind of like a rule, 'Well, they're black, I've got to get rid of them.' But these people, in my experience, are good jurors." (McMahon Tape at 56.) Accordingly, while it is quite clear from the Tape that Mr. McMahon would desire to strike a young black man from a low income area in Philadelphia, it is equally clear that Mr. McMahon would find an older black male who grew up in South Carolina highly desirable. This case is further complicated by the fact that, as discussed, *supra*, Mr. McMahon in the Tape provides numerous race neutral reasons for striking jurors, and advocated striking jurors who were social workers or attorneys, who were too smart, or who were too "esoteric." [17] Mr. McMahon was quite clear in the Tape that he would strike jurors who fit into these disfavored categories regardless of the color of their skin. (*See, e.g.*, McMahon Tape at 55.) Accordingly, the Court has considered the possibility that Mr. McMahon's strikes of individual African–American jurors in this case were based solely upon race neutral reasons, and not based upon the fact that the jurors were African–American.

However, notwithstanding such possibility, the Court finds as fact that at least one of the peremptory strikes exercised against African–American jurors by Mr. McMahon at Petitioner's trial was motivated at least in part by that juror's race. The categories of African–American jurors whom Mr. McMahon advocates striking are so broad that it is impossible for the Court to believe that none of the nine African–American jurors whom Mr. McMahon struck at Petitioner's trial were stricken at least in part because of their race. For example, based upon his statements in the Tape, Mr. McMahon would have endeavored at Petitioner's trial to exercise peremptory strikes against both "young" and "older" black women. (McMahon Tape at 56–57.) Furthermore, in the Tape Mr. McMahon never specifically defined the terms "young" and "older." Moreover, the parties have stipulated that Mr. McMahon actually exercised peremp-

---

16. Mr. McMahon felt that young black women made bad jurors because they "got two minorities, they're women and they're … blacks, so they're downtrodden in two areas. And they somehow want to take it out on somebody, and you don't want it to be you." (McMahon Tape, at 57.)

17. There is virtually no information in the record which sheds light upon the demographic characteristics (i.e., age, profession, etc.) of the jurors against whom Mr. McMahon exercised peremptory strikes.

Mr. McMahon's trial notes do contain limited information concerning the geographic location and employment status of some of the jurors whom he exercised peremptory strikes against. (Hearing Stip. Ex. 2.) However, Mr. McMahon's notes do not provide any background information for many of the jurors that he struck. Moreover, information concerning a prospective juror's employment status and the location of their residence does not shed any light upon whether these jurors would have been stricken on the basis of one of Mr. McMahon's more nebulous disfavored categories, (i.e., because they were too smart or too "esoteric.")

tory strikes against at least six black women at Petitioner's trial. (Hearing Stip. Ex. 4.) There is nothing in the record to indicate that these six jurors were stricken solely because they fit into one of Mr. McMahon's race neutral disfavored categories, and, given Mr. McMahon's statements in the Tape concerning black female jurors, it would not be reasonable for the Court to assume that this was the case.

Accordingly, the Court finds that Petitioner has established, by a preponderance of the evidence, that Mr. McMahon's decision to exercise a peremptory strike against one or more African–American members of the jury venire at Petitioner's trial was motivated by racial discrimination.

### D. *Mixed Motive Analysis*

▮ In cases where a Petitioner has established that race played a role in a prosecutor's decision to strike a potential juror, courts have allowed the prosecution to raise a mixed motive defense. Respondents have forcefully argued that a mixed motive analysis should be applied to this case, because the Tape and Mr. McMahon's hearing testimony establish that Mr. McMahon never struck a juror solely because of that juror's race. However, a mixed motive analysis is not helpful to Respondents. In a mixed motive analysis, it is the *respondent's* burden to establish that the prosecutor would have stricken the potential juror even if the juror were of a different race. *See Gattis v. Snyder*, 278 F.3d 222, 235 (3d Cir.2002). In order to meet this burden in this case Respondents would have to establish, at a minimum, that every one of the black jurors stricken by Mr. McMahon at Petitioner's trial because of their race fit into one of Mr. McMahon's race neutral disfavored categories, and therefore would have been stricken regardless of their race. Respondents have not come close to meeting this burden. Accordingly, Respondents' mixed motive argument fails.

### IV. CONCLUSION

For the foregoing reasons, the Court concludes, based upon all of the relevant evidence, that Petitioner has successfully established intentional discrimination by the prosecutor in selecting a jury in Petitioner's case. Accordingly, the Court grants Petitioner a Writ of Habeas Corpus.

The proper relief in this case is to vacate the convictions which resulted from the trial that is the subject of the instant Petition, and allow the Commonwealth of Pennsylvania to retry Petitioner before a properly selected jury within 180 days of the date of the accompanying order.

An appropriate order follows.

### ORDER

**AND NOW**, this 19th day of April, 2004, upon careful and independent review of the Petition for a Writ of Habeas Corpus (Docket # 1), the Report and Recommendation of Magistrate Judge Linda Caracappa, the hearings held on January 29, 2003, and September 29, 2003, and all related submissions, **IT IS HEREBY ORDERED** that the Petition for a Writ of Habeas Corpus is **GRANTED**. **IT IS FURTHER ORDERED** that Petitioner's convictions of May 16, 1984 for First Degree Murder and Possessing an Instrument of Crime, *see Commonwealth v. Wilson*, Nos. 2914, 2916 (December Term, 1983), are **VACATED**. The Commonwealth of Pennsylvania may retry Petitioner on these charges within 180 days of the date of this Order.