

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-13-2005

# Wilson v. Beard

Precedential or Non-Precedential: Precedential

Docket No. 04-2461

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Wilson v. Beard" (2005). *2005 Decisions.* Paper 298.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/298

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 04-2461
_____


ZACHARY WILSON

v.

JEFFREY A. BEARD, Commissioner of the Pennsylvania
Department of Corrections; DONALD T. VAUGHN,
Superintendent of the State Correctional Institution at
Graterford,

*Appellants*


_____


On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(D.C. No. 02-cv-0374)
District Judge: Honorable John R. Padova

_____


Argued April 11, 2005

Before: SCIRICA, *Chief Judge*, ROTH and BECKER, *Circuit
Judges*

(Filed: October 13, 2005)

LYNNE ABRAHAM
District Attorney
ARNOLD H. GORDON
First Assistant District Attorney
RONALD EISENBERG
Deputy District Attorney, Law Division

THOMAS W. DOLGENOS (ARGUED)
Chief, Federal Litigation
J. HUNTER BENNETT
Assistant District Attorney
1421 Arch Street
Philadelphia, PA 19102-1582

       *Attorneys for Appellants*

MICHAEL WISEMAN (ARGUED)
Capital Habeas Corpus Unit
Federal Court Division
Defender Association of Philadelphia
Suite 545 West
The Curtis Center
Philadelphia, PA 19106

CHRISTINA A. SWARNS (ARGUED)
NAACP Legal Defense & Education Fund, Inc.
99 Hudson Street
16th Floor
New York, NY 10013

       *Attorneys for Appellee*

_____

OPINION

_____

BECKER, *Circuit Judge*.

Jeffrey A. Beard and Donald T. Vaughn, Pennsylvania Corrections officials (hereinafter "the Commonwealth"), appeal from an order of the District Court granting Zachary Wilson a writ of habeas corpus and vacating his 1984 conviction for murder. The District Court found that Wilson was entitled to relief from his conviction under the Supreme Court's decision in *Batson v. Kentucky*, 476 U.S. 79 (1986), which prohibits the exclusion of potential jurors on account of their race. In reaching this conclusion, the District Court relied primarily on a

widely publicized videotape in which the prosecutor in Wilson's case, former Assistant District Attorney Jack McMahon, discusses various techniques for jury selection. In the tape, McMahon repeatedly advises his audience to use peremptory strikes to keep certain categories of African-Americans from serving on criminal juries, in apparent violation of *Batson*.

On appeal, the Commonwealth raises three issues. First, it claims that Wilson's habeas petition was untimely under 28 U.S.C. § 2244(d)(1), because Wilson failed to file his petition within one year of the date on which the McMahon tape first received coverage on the local news. This date, the Commonwealth argues, was the date on which Wilson could have discovered the tape's existence "through the exercise of due diligence." *Id.* § 2244(d)(1)(D). Because we find that Wilson, who denies timely knowledge of the reports, did not fail to exercise reasonable diligence in not monitoring the local news thirteen years after his conviction, we reject this argument. Also on the timeliness issue, the Commonwealth argues that the District Court erred in applying Rules 6(a) and 6(e) of the Federal Rules of Civil Procedure to determine the limitations period for Wilson's habeas petition. We conclude that both rules apply to habeas petitions and that the District Court's application of them was not error.

Second, the Commonwealth argues that 28 U.S.C. § 2254(e)(2) precluded the District Court from holding a hearing on Wilson's *Batson* claim, and that the District Court therefore erred in granting Wilson such a hearing. Because we conclude that Wilson satisfied the requirements of that statute, we will reject this argument. Finally, the Commonwealth argues that the District Court improperly applied the *Batson* framework in concluding that Wilson was entitled to relief from his conviction. We find that the District Court's conclusion that McMahon engaged in intentional discrimination in jury selection in Wilson's trial is amply supported by the record and that the District Court did not err in its application of *Batson*. We will therefore affirm the order of the District Court.

## I. Facts and Procedural History

Wilson was charged with first-degree murder and

3

possessing an instrument of crime for the February 1, 1982, shooting of David Smith following a dispute over a game of craps. On May 16, 1984, a jury convicted Wilson on both charges. He was subsequently sentenced to life in prison. The Pennsylvania Superior Court affirmed the conviction, *see Commonwealth v. Wilson*, 536 A.2d 830 (Pa. Super. 1987), and Wilson did not seek review before the state Supreme Court. In 1988, he filed a *pro se* petition seeking collateral review of his conviction pursuant to the Pennsylvania Post-Conviction Relief Act (PCRA), 42 Pa.C.S. § 9541 *et seq.* The PCRA Court denied Wilson's petition, and the Superior Court affirmed the denial. The State Supreme Court denied *allocatur*. *See Commonwealth v. Wilson*, 678 A.2d 365 (Pa. 1996).[1]

In 1997, Jack McMahon, the Assistant District Attorney who prosecuted Wilson's first case, won the Republican nomination to challenge incumbent District Attorney Lynne Abraham. On March 31, 1997, eleven days after the primary election, Abraham released a videotape from the late 1980s which showed McMahon giving a training session on jury selection to other prosecutors in the District Attorney's Office. In the tape, McMahon makes a number of highly inflammatory comments implying that he regularly seeks to keep qualified African-Americans from serving on juries. Since these comments are central to this appeal, we will quote from them at length.

McMahon began his presentation by reviewing the procedures followed by Pennsylvania courts in selecting juries. He then proceeded to discuss his views of the goals a prosecutor should have in mind in selecting a jury:

---

[1]Following his conviction for this crime, Wilson was tried for capital murder for the August 3, 1981, killing of Jamie Lamb. *See Commonwealth v. Wilson*, 629 A.2d 435 (Pa. 1994). Wilson was again convicted and, at the sentencing phase, the Commonwealth presented the jury with evidence of his previous conviction. The jury found two aggravating circumstances, including that Wilson "had a significant history of felony convictions involving the use or threat of violence," and sentenced him to death. *Id.* at 494 n.4.

4

The case law says that the object of getting a jury is to get—I wrote it down. I looked in the cases. I had to look this up because I didn't know this was the purpose of a jury. "Voir dire is to get a competent, fair, and impartial jury." Well, that's ridiculous. You're not trying to get that. You're—both sides are trying to get the jury most likely to do whatever they want them to do.

And if you go in there and any one of you think you're going to be some noble civil libertarian and try to get jurors, "Well, he says he can be fair; I'll go with him," that's ridiculous. You'll lose and you'll be out of the office; you'll be doing corporate law.

McMahon went on to discuss certain categories of people that he believed did not make good jurors. At various times in the tape, he told the assembled prosecutors to avoid "smart people," law students and lawyers, social workers, "very esoteric people," teachers, and "intelligent doctors." But the group he discussed most was African-Americans:

And that is—and, let's face it, again, there's the blacks from the low-income areas are less likely to convict. It's just—I understand it. It's understandable proposition. There is a resentment for law enforcement, there's a resentment for authority, and, as a result, you don't want those people on your jury. And it may appear as if you're being racist or whatnot, but, again, you are just being realistic. You're just trying to win the case.

McMahon told his audience that, while many types of blacks were poor jurors, certain blacks could be prosecution-friendly:

Another factor—I'll tell you, if—you know, in selecting blacks, again, you don't want the real educated ones, again. This goes across the board of all races; you don't want smart people. And,

5

again, but if you're sitting down and you're going to take blacks, you want older blacks. You want older black men and women, particularly men. Older black men are very good. Guys 70, 75 years old are very good jurors, generally speaking. . . .

Older black women, on the other hand, when you have like a black defendant who's a young boy and they can identify as his, you know—motherly type thing, are a little bit more different. . . .

The other thing is blacks from the South, excellent. . . .

In particular, he advised his audience to avoid black women:

Again, I think black men are—in my experience, black women, young black women, are very bad. There's an antagonism. I guess maybe because they're downtrodden on two respects, they got two minorities, they're women and they're and blacks, so they're downtrodden in two areas. . . . And so younger black women are difficult, I've found.

Despite his concerns regarding black jurors, McMahon cautioned his audience against selecting all-white juries:

And, again, some people say, well the best jury is an all white jury. I don't buy that, particularly with a black defendant, because you're going to have—you could have reverse reaction there. I think that you need dynamics because you don't want anybody to go back in there—because a lot of times your witnesses are going to be black; most of the time. So you don't want this all white jury to go back there and say to themselves, "Aw, who gives a shit?" You know what I mean? You don't want that attitude at all, and you may get that kind of reverse racism in your case.

I've always felt that a jury of like eight

whites and four blacks is a great jury, or nine and three, because then you're not going to get any of that in there. You're not going to get any of that racist type of attitude because a white guy is not going to sit in that jury and say, "Aw, them people live like this and that" with other blacks sitting in the room.

In order to maintain the proper racial composition, McMahon advised his audience to record the race of potential jurors:

Another thing to do . . . when a jury comes in the room, . . . count them. Count the blacks and whites. You want to know at every point in that case where you are. . . . You don't want to look there or go, "Is there a black back there? Wait a minute. Are you a black guy?"

McMahon then proceeded to end his presentation, ironically, with a brief discussion of the Supreme Court's decision in *Batson*:

One other—now, I'm sure you're all familiar, if we talk about the case law—I generally don't talk much about case law, but the new case is Batson versus Kentucky. I'm sure you've all become aware of that case. . . .
But in the future we're going to have to be aware of this case, and the best way to avoid any problems with it is to protect yourself. And my advice would be in that situation is when you do have a black jury, you question them at length. And on this little sheet that you have, mark something down that you can articulate later time if something happens, because if they—because the way the case is stated, that it's only after a prima facie showing that you're doing this that it becomes—that the trial judge can then order you to then start showing why you're striking them not on racial basis.

So if—let's say you strike three blacks to start with, the first three people. And then it's like the defense attorney makes an objection saying that you're striking blacks. Well, you're not going to be able to go back and say, oh—and make something up about why you did it. Write it down right then and there.

. . . So sometimes under that line you may want to ask more questions of those people so it gives you more ammunition to make an articulable reason as to why you are striking them, not for race. So that's how to pick a jury.

Following the release of the tape, Wilson filed a second PCRA petition alleging that McMahon had purposefully kept blacks off of his jury, in violation of *Batson* and *Swain v. Alabama*, 380 U.S. 202 (1965).[2] He had not raised the issue in either his direct appeal or his earlier PCRA filing. This second petition was dismissed by the PCRA Court, which found that the *Batson* claim had been waived pursuant to 42 Pa.C.S. § 9544(b).[3] This decision was affirmed by the Superior Court, and the Supreme Court denied *allocatur*.

Wilson then filed a petition for a writ of habeas corpus in the United States District Court, again raising the *Batson* claim. In response, the Commonwealth argued that the petition was barred by the one-year statute of limitations applicable to such

---

[2]The requirements of a valid *Batson* claim are set forth in more detail below. In order to prevail under *Swain*, the defendant must "show a pattern and practice of racial discrimination in jury selection across multiple prosecutions." *Sistrunk v. Vaughn*, 96 F.3d 666, 668 (3d Cir. 1996).

[3]That section provides:

ISSUES WAIVED.—For purposes of this subchapter, an issue is waived if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state postconviction proceeding.

claims under the Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2241, *et seq.* The Commonwealth also argued that the claim was procedurally defaulted.

The petition was referred to a Magistrate Judge, who recommended that it be dismissed as untimely. The District Court, after holding an evidentiary hearing to determine whether the petition was time-barred, rejected the Magistrate Judge's recommendation and concluded that the petition was timely and that the *Batson* claim was not procedurally defaulted. *See Wilson v. Beard*, 2003 U.S. Dist. LEXIS 9737 (E.D. Pa. May 8, 2003). The District Court then held a second evidentiary hearing, this time addressing the merits of Wilson's *Batson* claim. Following the hearing, the District Court issued an opinion finding that McMahon had violated *Batson* in Wilson's trial. It therefore granted Wilson's habeas petition and vacated his conviction. *See Wilson v. Beard*, 314 F. Supp. 2d 434 (E.D. Pa. 2004). The Commonwealth filed a timely appeal to this Court.

The District Court properly exercised jurisdiction over Wilson's habeas petition pursuant to 28 U.S.C. § 2241(a) and § 2254(a), and we exercise jurisdiction pursuant to 28 U.S.C. § 1291 and § 2253(c)(1)(A). Because Wilson's *Batson* claim was never addressed in state court, the District Court exercised plenary review. *See* 28 U.S.C. § 2254(d). We exercise plenary review of a district court's legal conclusions in a habeas proceeding; however, any factual determinations made by the District Court will be upheld unless found to be clearly erroneous. *See Caswell v. Ryan*, 953 F.2d 853, 857 (3d Cir. 1992).

## II.

### A. The Timeliness of Wilson's Habeas Petition

Under 28 U.S.C. § 2244(d)(1), habeas petitions filed by state prisoners are subject to a one-year statute of limitations. The limitations period begins to run on the latest of several dates, including "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." *Id.* § 2244(d)(1)(D). Wilson argues that the discovery of the McMahon videotape constitutes

9

the "factual predicate" for his habeas claim. He further argues that he did not discover, and through the exercise of due diligence could not have discovered, the existence of the tape prior to April 6, 1997.

Wilson's habeas petition was filed on January 23, 2002, four years and 292 days after April 6, 1997. AEDPA provides that the limitations period is tolled during the pendency of state court postconviction proceedings. *See id.* § 2244(d)(2). Three years and 293 days elapsed from the date on which Wilson's PCRA petition was filed (June 2, 1997) and the date on which the Supreme Court denied *allocatur* (March 22, 2001), hence, there is tolling for this period. Thus, if April 6, 1997, is used as the start of the limitations period, Wilson's petition was timely by one day.[4]

We must therefore determine the precise date on which Wilson, through the exercise of due diligence, could have discovered the existence of the McMahon tape. In the District Court, the Commonwealth argued that the tape did not constitute the factual predicate for Wilson's habeas petition, but it does not press this issue on appeal. It does contend, however, that McMahon could have discovered the existence of the videotape as early as April 1, 1997, and that, if he could, Wilson's petition was filed four days too late.

Certain facts are not in dispute. During the relevant period of time, Wilson was housed on death row in Graterford Prison. He had cable television in his cell and could have subscribed to local newspapers but apparently chose not to do so. At his first evidentiary hearing, Wilson testified that prisoners on death row are kept in individual cells but are permitted to exercise in a cage with one other prisoner for one hour each day. No incoming phone calls are permitted except for those from a prisoner's attorney; outgoing calls are limited to four per month and must be scheduled one day in advance, while prison visits are limited to one per week. 2003 U.S. Dist. LEXIS 9737 at *18 n.13.

---

[4]These calculations assume that Fed. R. Civ. P. 6(a) is used in calculating the limitations period. This issue is discussed further below. *See infra* Part III.B.

The District Court found, and Wilson does not dispute, that the McMahon videotape received widespread attention on local newscasts on April 1st, 2nd, and 3rd. *Id.* at *17.[5] The court found that each of the four major Philadelphia television stations reported on the tape "at numerous times" during the three-day period. *Id.* In addition, it is undisputed that, on April 3, 1997, the District Attorney's Office mailed a letter to Billy Nolas, Wilson's counsel in his capital case at that time, informing him of the existence of the McMahon tape. The date the letter was received is unknown.

Wilson testified that he did not see any of the television reports concerning the McMahon tape and did not learn of its existence until he was contacted by another attorney on his case, Christina Swarns. The District Court, which found this testimony to be credible, noted that Swarns "was not involved with [Wilson's] case" during the period of April 1-5, 1997. It therefore concluded that the phone call took place after April 5, 1997, and that Wilson did not have actual knowledge of the tape on or before that date. *Id.* at *17 n.12, *19. In support of this conclusion, the District Court further noted that Wilson testified that he never discussed his case with other inmates, and it found that he thus was unlikely to have learned about the tape from others in the prison. The Court also observed that Wilson "was not shy about asserting his rights," *id.* at *19, and presumably would have acted had he learned about the tape's existence during the period in question.

On appeal, the Commonwealth does not argue that Wilson had actual knowledge of the tape's existence prior to April 6, 1997. It instead argues that, given the widespread attention the tape received, Wilson could easily have discovered its existence prior to April 6, 1997. The District Court rejected this argument, finding that Wilson's failure to discover the tape's existence during the period in question was not due to a lack of diligence.

While it is certainly true that Wilson could have discovered the tape's existence fortuitously, AEDPA directs us

---

[5]The first coverage of the tape was on the evening of March 31, 1997, the day Abraham released it.

to determine the "the date on which the factual predicate of the claim or claims presented could have been discovered *through the exercise of due diligence*." 28 U.S.C. § 2244(d)(1)(D) (emphasis added). Thus, it is not enough to suggest that Wilson could have learned about the tape by happenstance; rather, it must be shown that, had he exercised due diligence, Wilson would have taken certain actions through which he would have learned about the tape prior to April 6, 1997.

We have held that, to satisfy § 2244(d)(1)(D)'s "due diligence" standard, a prisoner must exercise "reasonable diligence in the circumstances." *See Schlueter v. Varner*, 384 F.3d 69, 74 (3d Cir. 2004). The ultimate question whether a petitioner exercised due diligence is one of fact which we will set aside only if it is clearly erroneous; however, we can review de novo the legal standard employed by the District Court in assessing the petitioner's conduct. *See Hasbro Industries, Inc. v. M§ "St. Constantine,"* 705 F.2d 339, 341 (9th Cir. 1983). As *Schlueter* makes clear, the question whether a habeas petitioner has exercised due diligence is context-specific. The fact that we require a petitioner in one situation to undertake certain actions does not necessitate that we impose the same burden on all petitioners.

The District Court determined that Wilson had not failed to exercise due diligence during the period in question, finding that "it would not be logical or fair to read the concept of due diligence as imposing upon a criminal defendant the duty of continuously monitoring the local news for a period of 12 or more years in the hope of possibly learning facts which could be helpful to his case." 2003 U.S. Dist. LEXIS 9737 at *22. We agree. No person in Wilson's position would reasonably expect that the local news would be a source of information relevant to his case, given that his conviction had occurred thirteen years ago and his final appeal had been rejected by the Supreme Court the previous year.

In some cases, a defendant will have reason to believe that the news will potentially be a source of information about his case, and in these situations it might not be unreasonable to expect the prisoner to monitor the news on a somewhat regular basis. But absent some reasonable basis for concluding that the local news is likely to be a source of information at the particular

12

time, due diligence does not require a prisoner in Wilson's position to monitor the news on a regular basis on the unlikely chance that he might learn something which would be useful to his case. The Commonwealth has pointed to no evidence from which we could conclude that Wilson had a reason to expect that he would uncover any relevant information by monitoring the news, and we see none. We therefore conclude that his failure to learn about the tape was not a failure to exercise due diligence.

The Commonwealth nonetheless argues that our decision in *Schlueter* requires that we reverse. *Schlueter* interpreted the due diligence standard under 28 U.S.C. § 2244(d)(I)(D) in a case in which a prisoner filed his petition several years after his conviction became final. Schlueter alleged that he did not discover, and could not have discovered through the exercise of due diligence, the factual predicate of his claim, which was that one of the part-time public defenders who represented him during his plea negotiations was a law partner of the part-time Assistant District Attorney in the case. We held that if the petitioner had exercised due diligence, "he could have discovered [the relationship between the two attorneys] long before the AEDPA became effective" and therefore filed a timely habeas petition. 384 F.3d at 74.

In reaching this conclusion, we concluded that it was "inconceivable" that the two attorneys could have hidden their relationship "from the relatively small legal community or the public in Northampton County." We further noted that Schlueter could have learned about the relationship simply by interviewing the other part-time public defender in the case. *Id.* Finally, we acknowledged that the petitioner was incarcerated during the relevant period and that "physical confinement can limit a litigant's ability to exercise due diligence," but we noted that the petitioner's parents had been heavily involved in his case and could have uncovered the relationship through their own investigation. *Id.* at 75.

The Commonwealth argues that, because the relevant information in *Schlueter* was known to a relatively small community and the information in this case was widely disseminated through the media, Wilson does not satisfy *Schlueter*'s standard of due diligence. We disagree. The essential question is not whether the relevant information was

13

known by a large number of people, but whether the petitioner should be expected to take actions which would lead him to the information. In *Schlueter*, we found that the petitioner could have learned the relevant fact simply by interviewing his surviving trial counsel during the time in which a reasonable person in his position would be investigating opportunities for postconviction relief. In contrast, Wilson had no expectation that the news media would be a source of information about his case nearly thirteen years after his conviction. Therefore, we hold that he did not fail to exercise due diligence during the period of April 1–April 5, 1997, and that the limitations period did not begin to run before April 6, 1997.

### B. Application of Rule 6(a)

The Commonwealth argues that the District Court erred in relying on Rule 6(a) of the Federal Rules of Civil Procedure in calculating the end of the limitations period. Rule 6(a) states: "In computing any period of time prescribed or allowed by . . . any applicable statute, the day of the act, event, or default from which the designated period of time begins to run shall not be included." Thus, the District Court, relying on this rule, concluded that Wilson had 365 days from the day he had notice of the McMahon tape to file his habeas petition. The Commonwealth argues that the District Court should have counted the day he received notice of the tape as day 1, thus giving him 364 days in which to file his petition.

We disagree. First, the Federal Rules of Civil Procedure apply, by their own terms, to habeas cases. Rule 81(a)(2) states: "These rules are applicable to proceedings for . . . habeas corpus . . .to the extent that the practice in such proceedings is not set forth in statutes of the United States, the Rules Governing Section 2254 cases . . . and has heretofore conformed to the practice in civil actions." The Commonwealth has pointed to no statutory authority that would permit us to hold that Rule 6(a) does not apply in this context, and we see none. Indeed, every other regional Court of Appeals has either implicitly or explicitly

14

held that Rule 6(a) applies to the AEDPA limitations period.[6]

Moreover, common sense dictates that the date on which the factual predicate occurs not count as part of the one-year limitations period. If we measure from the precise moment the petitioner receives notice of the factual predicate, then the one-year period ends on the 365th day following such notice, not, as the Commonwealth argues, on the 364th day. Thus, were we not to apply Rule 6(a), we would essentially shorten the limitations period to just under one year.

The Commonwealth does not directly address these arguments, but relies on *Burns v. Morton*, 134 F.3d 109 (3d Cir. 1997), for the proposition that, in this Circuit, Rule 6(a) is not applicable to the one-year habeas statute of limitations. *Burns* addressed the question whether state prisoners whose sentences became final before the passage of AEDPA on April 24, 1996 were entitled to one year following AEDPA's passage to file habeas petitions. We decided that they were, holding that "petitions filed on or before April 23, 1997, may not be dismissed for failure to comply with § 2244(d)(1)'s time limit." *Id.* at 111. The Commonwealth argues that, since AEDPA was enacted on April 24, 1996, the Court's reference to April 23, 1997 as the end of the one-year "grace period" should be read as an implicit rejection of the application of Rule 6(a) to the habeas statute of limitations.

We are not persuaded. As Wilson points out, the prisoner

---

[6]*See Rogers v. United States*, 180 F3d 349, 355 n.13 (1st Cir. 1999); *Mickens v. United States*, 148 F. 3d 145, 148 (2d Cir. 1998); *Hernandez v. Caldwell*, 225 F. 3d 435, 436 (4th Cir. 2000); *Flanagan v. Johnson*, 154 F.3d 196, 200-01 (5th Cir. 1998); *Bronaugh v. Ohio*, 235 F.3d 280, 284-85 (6th Cir. 2000); *Newell v. Hanks*, 283 F.3d 827, 833 (7th Cir. 2002); *Moore v. United States*, 173 F.3d 1131, 1135 (8th Cir. 1999); *Patterson v. Stewart*, 251 F.3d 1243, 1246 (9th Cir. 2001); *United States v. Hurst*, 322 F.3d 1256, 1260-61 (10th Cir. 2003); *Moore v. Campbell*, 344 F.3d 1313, 1319-20 (11th Cir. 2003); *cf. United States v. Cicero*, 214 F.3d 199, 202 (D.C. Cir. 2000) (holding that the "grace period" under AEDPA lasted until April 24, 1997, thus implicitly applying the principle underlying Rule 6(a)).

15

in *Burns* filed his petition on April 22, 1997, so the application of Rule 6(a) had no impact on his case. In addition, nowhere in *Burns* does the Court mention Rule 6(a) or even mention that an issue exists regarding the precise end of the one-year period. More importantly, *Burns* does not state that petitions filed on or after April 24, 1997 by prisoners whose convictions became timely before the passage of AEDPA should be considered untimely; rather, it simply states that petitions filed on or before April 23, 1997 "may not be dismissed" as time-barred. Thus, the case does not explicitly hold that the grace period ended on April 23, 1997; it simply holds that it did not end *before* April 23, 1997. For this reason, and given the clear weight of authority and common sense, we hold that Rule 6(a) applies to the AEDPA statute of limitations, and any suggestion to the contrary in *Burns* is incorrect.[7]

## C. Application of Rule 6(e)

The Commonwealth also argues that it was error for the District Court to apply Rule 6(e) to Wilson's case. Rule 6(e) provides:

> Additional Time After Service Under Rule 5(b)(2)(B), (C), or (D). Whenever a party has the right or is required to do some act or take some proceedings within a prescribed period after the service of a notice or other paper upon the party and the notice or paper is served upon the party under Rule 5(b)(2)(B), (C), or (D), 3 days shall be added to the prescribed period.

The District Attorney's Office wrote to Wilson's counsel informing him of the existence of the McMahon tape on April 3, 1997. The District Court concluded that Rule 6(e) required adding three additional days to determine the date on which the

---

[7] The Court of Appeals for the Tenth Circuit, when presented with precisely the same question, reached the result we do today. *See Hurst*, 322 F.3d at 1261 n.4.

16

letter was received. Thus, it considered the letter as having been received on April 6, 1997, and concluded that this was the date on which Wilson had notice of the existence of the McMahon videotape. The District Court found that Wilson's petition was filed 364 days later (allowing for tolling), and thus was not time-barred.

The Commonwealth argues that Rule 6(e) is a rule of service that applies only to parties in a lawsuit. Since no habeas petitioner is a party to his suit *before* it is filed, according to the Commonwealth, Rule 6(e) has no application. In response, Wilson correctly notes that we have applied Rule 6(e) to determine when the limitations period begins for a Title VII plaintiff who receives a "right-to-sue" letter from the EEOC, even though a plaintiff receiving such a letter is not currently a party to a suit. *See Seitzinger v. Reading Hosp. & Med. Ctr.*, 165 F.3d 236 (3d Cir. 1999). The Commonwealth attempts to distinguish *Seitzinger* on the ground that the 90-day period in Title VII cases is considerably shorter than the one-year period under AEDPA, and that in this case there was widespread publicity concerning the McMahon tape in addition to the letter to Wilson's counsel.

We think that the logic of *Seitzinger* is equally applicable to the habeas context. AEDPA states that the limitations period begins to run on the date that the factual predicate "could have been discovered through the exercise of due diligence." To argue, as the Commonwealth does, that no additional time should be added from the date a letter is sent is to maintain that, through the exercise of due diligence, a habeas petitioner should be able to learn the contents of a letter the day it is mailed. Due diligence does not require such psychic powers. Particularly given that the statute of limitations is an affirmative defense, *see Long v. Wilson*, 393 F.3d 390, 397 (3d Cir. 2004), we are not willing to impose upon habeas petitioners this burden.

Thus, given that federal courts must add some additional period of days to the limitations period to account for the time it takes for a letter to be received, we think it eminently sensible to apply Rule 6(e). *Cf. Seitzinger*, 165 F.3d at 239. We therefore conclude that, in the absence of proof of the actual date of receipt, three days should be added to the habeas limitations period for Wilson's petition. Since the Commonwealth

concedes that "it could not be said with absolute certainty when Mr. Wilson received the Commonwealth's April 3, 1997 letter," it was not error for the District Court to apply Rule 6(e).

## D. Wilson's Entitlement to an Evidentiary Hearing

The Commonwealth contends that it was error for the District Court to hold a factual hearing to allow Wilson to develop the record regarding his *Batson* claim. Under 28 U.S.C. § 2254(e)(2), a habeas petitioner is not permitted a factual hearing in the District Court if he has "failed to develop the factual basis of a claim in State court proceedings," unless he satisfies one of two exceptions, neither of which is relevant here. The District Court concluded that Wilson had not "failed to develop the factual basis of [his] claim in State court proceedings" and therefore was not barred from receiving a hearing under § 2254(e)(2). The Commonwealth disputes this conclusion.

In his second PCRA petition, Wilson requested an evidentiary hearing to develop the factual record on his claim. The Court of Common Pleas denied Wilson's petition on several grounds, and the Superior Court affirmed, finding that Wilson's *Batson* claim had been waived.[8] The Commonwealth argued in the District Court that, because the PCRA courts had found Wilson's *Batson* claim to be waived, he had procedurally defaulted that claim for purposes of habeas review. It is well settled that, under normal circumstances, a District Court cannot grant habeas relief on a claim that is procedurally defaulted. *See Harris v. Reed*, 489 U.S. 255, 262 (1989). Yet a claim is not procedurally defaulted merely because a state court concluded that it was waived under a state procedural rule; rather, it must also be shown that the state rule constitutes an "adequate" and "independent" ground barring review.

In concluding that Wilson's *Batson* claim was not procedurally defaulted, the District Court found that the rule the

---

[8]The Court of Common Pleas also concluded that Wilson was not entitled to relief on the merits. The Superior Court did not address that ground.

Superior Court relied on in refusing to consider the claim was not "adequate." According to the Supreme Court, a state rule is not adequate unless it is "'strictly or regularly followed,"' *Johnson v. Mississippi*, 486 U.S. 578, 587 (1988) (quoting *Hathorn v. Lovorn*, 457 U.S. 255, 263 (1982)). The Superior Court held that the *Batson* claim was waived based on the Pennsylvania Supreme Court's decision in *Commonwealth v. Lark*, 746 A.2d 585 (Pa. 2000). The District Court found that, in relying on *Lark*, the Superior Court ignored a more relevant decision, *Commonwealth v. Basemore*, 560 Pa. 258 (Pa. 2000), and in so doing "failed to apply State Supreme Court precedent which was directly on point." 2003 U.S. Dist. LEXIS 9737 at *43.

We agree with the District Court that the grounds relied on by the Superior Court were not adequate. In particular, we think that the Superior Court's reliance on *Lark* was incorrect. In *Lark*, a case in which the defendant was prosecuted by another Assistant District Attorney in McMahon's office, the Supreme Court held that a *Batson* claim based on the McMahon tape was not untimely due to the petitioner's failure to raise it before knowing of the tape's existence. 746 A.2d at 588. It went on to hold, however, that the McMahon tape did not entitle the petitioner in that case to relief, because he was tried by another prosecutor before the tape was made. *Id.* at 589.

In contrast, in *Basemore*, a case involving a defendant who was prosecuted by McMahon himself, the Pennsylvania Supreme Court held that the "practices described in the transcript [of the McMahon tape] support an inference of invidious discrimination." *See* 744 A.2d at 731–32. In that case, the Supreme Court held that the defendant was entitled to "the opportunity to develop a record concerning the alleged violation, Mr. McMahon's conduct and its implications with respect to his trial" such that he could prove his eligibility for relief. *Id.* at 733.[9]

---

[9]The Commonwealth argues that *Basemore* is distinguishable from this case because the petitioner in *Basemore* kept a better record of what happened during voir dire than did Wilson. While Basemore alleged in his brief that McMahon had

On appeal, the Commonwealth does not directly challenge the District Court's determination that Wilson's claim was not procedurally defaulted. However, the question whether a claim is procedurally defaulted and whether § 2254(e)(2) bars an evidentiary hearing related to that claim are analytically linked. *See Williams v. Taylor*, 529 U.S. 420, 432 (2000); *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 7-8 (1992). If a petitioner requests a hearing to develop the record on a claim in state court, and if the state courts (as they did here) deny that request on the basis of an inadequate state ground, the petitioner has not "failed to develop the factual basis of [the] claim in State court proceedings" for purposes of § 2254(e)(2).[10] For this reason, we conclude that § 2254(e)(2) did not preclude the District Court from holding a hearing on Wilson's *Batson* claim.[11]

---

exercised nineteen peremptory challenges against African-Americans, the Supreme Court noted that "the allegation was not included in Basemore's supplemental post-conviction petition, nor was any witness identified or documentary proof attached." *See* 744 A.2d at 729. The Commonwealth also notes that the *Basemore* Court did not specifically find that the claim was not waived. On remand, however, the PCRA Court found that the claim was not waived and granted Basemore a new trial. In addition, the Supreme Court clearly held that the petitioner in *Basemore* was entitled to a hearing to develop the record on his claim.

[10]The analogy between § 2254(e)(2) and procedural default is imperfect. Section 2254(e)(2) creates a higher bar for petitioners who fail to exercise due diligence than does the "cause and prejudice" standard of the procedural default context. In addition, the doctrine of procedural default is not directly relevant to those situations in which a petitioner is given a hearing on a claim in state court but nonetheless fails to fully develop the record on the claim.

[11]The Commonwealth argues that, because Wilson's habeas petition suggests that he would have a valid *Batson* claim independent of the McMahon tape, Wilson failed to exercise due diligence by not developing the record on that claim in state court before the tape became public. (In making this argument, the

20

## IV. Wilson's *Batson* Claim

As the Supreme Court has held, "Discrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice." *Rose v. Mitchell*, 443 U.S. 545, 555 (1979). Thus, for well over a century, the Court has recognized the bedrock principle that "the State denies a black defendant equal protection of the laws when it puts him on trial before a jury from which members of his race have been purposefully excluded." *Batson v. Kentucky*, 476 U.S. 79, 85 (1986) (citing *Strauder v. West Virginia*, 100 U.S. 303 (1880)). Such discrimination "not only violates our Constitution and the laws enacted under it but is at war with our basic concepts of a democratic society and a representative government." *Smith v. Texas*, 311 U.S. 128, 130 (1940).

In *Batson v. Kentucky*, the Court reaffirmed and strengthened this fundamental principle.[12] *Batson* explicitly held that the prohibition on racial discrimination in jury selection

---

Commonwealth relies on language in Wilson's petition claiming that the tape, McMahon's lifetime strike rate, and "what is known about Petitioner's actual voir dire," each "singularly or in combination, raise at least an inference of discrimination."

We decline to accept this argument. The tape is the centerpiece of Wilson's *Batson* claim, and so his failure to develop the record on that claim before he knew of the tape's existence should not bar him from a hearing now. Notwithstanding the assertions in Wilson's habeas petition, we think it unlikely that he would prevail on a *Batson* claim without the tape as evidence, and we are unwilling to find that § 2254(e)(2) requires a defendant to pursue claims that are likely to be fruitless. Our conclusion is further buttressed by the "inherently covert nature of conduct constituting the underlying violation" and the fact that the tape's existence was concealed from Wilson for nearly a decade. *See Basemore*, 744 A.2d at 733.

[12]*Batson* was decided two years after Wilson's trial; however his case was still on direct appeal when the decision came down. Therefore, he is entitled to the benefit of that decision. *See Hamling v. United States*, 418 U.S. 87, 102 (1974).

extends to the prosecutor's use of peremptory challenges. *See Batson*, 476 U.S. at 89 ("[T]he Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race."). The decision recognized the difficulty defendants will often have in showing intentional discrimination, so it created a three-step framework for judges to employ in determining whether a prosecutor has violated the Equal Protection Clause:

> First, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes. Third, "if a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination."

*Johnson v. California*, 125 S. Ct. 2410, 2416 (2005) (footnotes and citations omitted) (alteration in original). The District Court applied this framework and concluded that Wilson had shown that McMahon engaged in purposeful discrimination. On appeal, the Commonwealth disputes several aspects of the District Court's analysis.

## A. Facts Underlying Wilson's Claim

The parties have stipulated that Wilson's jury consisted of nine whites, two blacks, and one juror of unknown race.[13] They also stipulated that McMahon used at least eight of his sixteen peremptory challenges against blacks. The District Court found that a ninth potential juror challenged by McMahon was black, although the Commonwealth challenges this conclusion on

---

[13]Most of the transcript of Wilson's voir dire has been lost, hence the factual record is incomplete.

appeal. Wilson submitted voter registration records for three more individuals he alleged were also struck by McMahon. The District Court, noting that the names were very common, refused to find that the three additional individuals struck by McMahon were those identified by Wilson.

Thus, the District Court concluded that, of the sixteen people struck by McMahon, nine were black. The Commonwealth argues that the remaining individuals struck by McMahon were "non-African-American." Wilson disputes this claim, arguing instead that they were all of unknown race. We see nothing in the record or in the District Court's opinion supporting the Commonwealth's claim, so we agree with Wilson that the race of the seven remaining individuals is unknown.

Finally, the District Court found that McMahon noted the race and gender of eleven of the twelve jurors in Wilson's panel. 314 F. Supp. 2d at 448. It concluded that the Commonwealth "offered no . . . legitimate rationale for Mr. McMahon's decision to make such notations," given that Wilson's trial predated *Batson*. *Id.* at 448.[14]

## B. *Batson* Step One

A defendant satisfies the first step of the *Batson* analysis "by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." *Johnson*, 125 S. Ct. at 2417. *Batson* itself stressed the open-ended nature of the step one inquiry:

> In deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances. For example, a "pattern" of strikes against black jurors included in the particular venire might give rise to an inference of discrimination. Similarly, the prosecutor's questions and statements during *voir dire*

---

[14]The District Court noted that *Batson* gives prosecutors an incentive to record the race of potential as well as actual jurors, as such information may "assist them in meeting their burden at Step Two." *Id.* at 448 n.15.

examination and in exercising his challenges may support or refute an inference of discriminatory purpose. These examples are merely illustrative. We have confidence that trial judges, experienced in supervising *voir dire*, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors.

*Batson*, 476 U.S. at 96-97.

The District Court found that Wilson had established a prima facie *Batson* violation, relying primarily on McMahon's statements in the videotape as well as what was known about McMahon's conduct at Wilson's jury selection. We agree. The evidence in the McMahon tape, coupled with the fact that every juror challenged peremptorily by McMahon whose race was determined by the District Court was black, provides extremely strong support for the conclusion that McMahon engaged in purposeful discrimination. There is no doubt that a judge, relying on this evidence, could easily "draw an inference that discrimination has occurred."

We recently noted that, "in some circumstances, suspicious questioning, coupled with strikes that seem to implement the thrust of the questioning, may be enough" to satisfy step one. *See Bronshtein v. Horn*, 404 F.3d 700, 723 (3d Cir. 2005). Certainly, then, an admission by the prosecutor that he uses peremptory strikes to keep certain categories of African-Americans from serving, coupled with a limited record showing that he used many of his strikes on African-Americans in the case at issue, is sufficient. We therefore conclude that Wilson carried his burden under step one of *Batson*.[15]

_____

[15]McMahon's own testimony at the evidentiary hearing further supports this conclusion. As the District Court found, McMahon was equivocal as to whether race was ever a factor in his decision-making:

The Court: Did race ever play a factor in your determining who to challenge and who not to

24

## C. *Batson* Step Two

Once the defendant has satisfied step one, "the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes." *Johnson*, 125 S. Ct. at 2416 (citation omitted). The District Court decided that, given that twenty years had elapsed since Wilson's trial, it would be unreasonable to expect McMahon to remember why he struck certain individuals.[16] Instead, it concluded that the various race-neutral reasons McMahon offers in the videotape for striking jurors—such as his recommendation that prosecutors strike lawyers and law students—were sufficient to carry the Commonwealth's burden at step two.

As Wilson notes, McMahon failed to offer a race-neutral explanation for all but one of the African-Americans he struck at trial. Still, in light of the passage of time, we agree with the District Court that it was appropriate to lessen the burden of the Commonwealth at step two. At all events, because we conclude that the District Court's determination that Wilson showed

---

challenge peremptorily?

Mr. McMahon: I understand. Do you—that's a tough question, Your Honor. I can't say that it—because sometimes they're intertwined. I would say that—was it ever a factor? In some ways, I guess, yes. In some ways I would think—in certain situations, maybe, but only because of its correlation to another factor, not because of the color of their skin. It was really other things and its because of other issues that would be the reason for a peremptory strike. I don't see race as being the reason.

314 F. Supp. 2d at 442.

[16]McMahon testified that he struck one of the jurors, Darrell Lampkin, because his brother was in prison at the time of the trial. The District Court found that this explanation was not pretextual. *See* 314 F. Supp. 2d at 443.

intentional discrimination was amply supported by the evidence, we need not determine whether its finding at step two was correct. Even if the District Court erred in giving the Commonwealth the benefit of the doubt at step two, it nonetheless reached the correct result at step three, so any such error had no impact on its ultimate determination that Wilson was entitled to habeas relief.

### D. Batson *Step* Three

At step three, the court must determine "whether the opponent of the strike has proved purposeful racial discrimination." *Johnson*, 125 S. Ct. at 2416. A determination that a petitioner has shown intentional discrimination is a factual finding that we may not upset unless it is shown to be clearly erroneous. *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). The District Court concluded that Wilson had shown purposeful discrimination with respect to "at least one of the peremptory strikes exercised against African-American jurors." 314 F. Supp. 2d at 449.

In reaching this conclusion, the Court found that, given the breadth of the categories of black jurors whom McMahon recommends striking in the videotape, it would be difficult to accept that all of the black jurors struck by McMahon were struck for reasons that were race-neutral. In particular, the District Court noted that McMahon struck at least six black women, consistent with statements he made in the tape that "young" and "older" black women did not make prosecution-friendly jurors. In addition, the Court noted that McMahon had recorded the races of the members of the jury.

In challenging the District Court's conclusion, the Commonwealth makes several arguments. First, it argues that the techniques McMahon discusses in the tape could have been developed after Wilson's trial. Next, it argues that the record shows that McMahon used his strikes evenly against African-Americans and others, and that he therefore did not engage in intentional discrimination. Finally, it argues that the District Court did not identify any individual juror who was struck because of his or her race, and that the court therefore erred in granting relief.

26

We see no merit to the Commonwealth's suggestion that McMahon developed the techniques in the tape in the years after Wilsons's trial. While the tape was made about two years after Wilson was convicted, McMahon leaves no doubt that he had developed the techniques he advocates over the course of his career:

> Now, I'm going to tell you things that I think over the years that have come to me of doing this . . . I've had fairly good success with these rules and I think if you stay to them, you'll have fairly good success, too.

McMahon had worked in the District Attorney's office for six years prior to Wilson's trial. It simply defies logic to suggest that all of the techniques which he so forcefully advocates in the tape suddenly came to him during the two years between Wilson's trial and the training session at which the tape was made.

Indeed, McMahon advises his audience to follow the same techniques in each trial, going so far as to compare picking a jury to following proper strategy in blackjack:

> But the key is, just as in playing blackjack, is to stay by the rules . . . And that's all I can tell you when you talk to you [*sic*] about this, is to play by certain rules and don't bend them and don't change them.

In light of these statements, we conclude that the District Court was justified in concluding that McMahon almost certainly followed the techniques he advocates in the tape during Wilson's trial. Indeed, given that McMahon used at least nine of his peremptory strikes on African-Americans, we think it abundantly clear that McMahon made full use of the techniques he discusses in the tape in Wilson's trial.

The Commonwealth next contends that because McMahon used "an equal—or nearly equal—number of peremptory challenges on non-African-American jurors," he used his peremptory challenges "in an evenhanded manner." This argument is premised on the Commonwealth's erroneous assertion that the seven individuals struck by McMahon whose race is not known were "non-African-American." Again, we see

27

no evidence to support this conclusion. In fact, it appears that every juror challenged by McMahon whose race was determined by the District Court was black. Certainly this record cannot be called "evenhanded."

Finally, the Commonwealth argues that the District Court "cannot point to any particular juror who was struck because of his or her race." Rather, the Commonwealth suggests that all of the black jurors in question could have been struck for any of the race-neutral explanations offered by McMahon in the videotape. It is certainly possible that one or more of the black jurors in question was struck for reasons having nothing to do with race. But the burden is not on Wilson to prove with certainty that McMahon engaged in intentional discrimination with respect to each juror in question. Rather, his burden is to show that it is more likely than not that McMahon did so with respect to at least one of the jurors he struck. *See Johnson*, 125 S. Ct. at 2417. We agree with the District Court that Wilson has carried this burden. Indeed, we think the evidence would support the conclusion that McMahon acted with the requisite discriminatory intent toward any one of the eight jurors in question.

At all events, when we consider all of the relevant evidence, it is virtually impossible to conclude that McMahon did not strike at least one of the jurors for an impermissible reason. In light of the policy expressed in the tape, the fact that McMahon challenged a significant number of African-American members of the venire, and his equivocal statements to the District Court, we agree with the District Court's ultimate conclusion that McMahon acted with the requisite discriminatory purpose.[17] There can be no doubt that if McMahon practiced in Wilson's trial what he preached in the tape, he violated *Batson*. Since what is known about Wilson's voir dire suggests that he did, we have no hesitation in affirming the District Court on this

---

[17]For this reason, we also reject the Commonwealth's assertion that the District Court erred in its "mixed-motive" analysis. The evidence supports the conclusion that McMahon struck at least one potential juror because of his or her race, which is all the petitioner must show under *Batson*.

28

point.[18]

## V. Conclusion

In sum, we hold that the District Court did not err in its application of the *Batson* framework.[19] Wilson has submitted compelling evidence showing that the prosecutor in his case regularly acted with discriminatory animus toward African-American jurors. This evidence, coupled with the fact that numerous African-Americans were stricken from his jury, gives rise to an almost unavoidable inference that the prosecutor engaged in prohibited discrimination in this case. For the above reasons, the District Court did not err in its grant of the writ, hence we will affirm its order.

---

[18]It is also important to remember that a primary justification for the *Batson* burden-shifting framework is the recognition that direct evidence of the prosecutor's discriminatory intent will often be hard to produce. *See Basemore*, 560 Pa. at 284. This case is the rare instance in which such direct evidence is available.

[19]Because we conclude that Wilson is entitled to relief under *Batson*, we need not address his argument that he is also entitled to relief under *Swain*.